OPINION OF THE COURT
Gerald Lebovits, J.
1. Introduction
In July 2000, petitioner served respondent with a combined termination notice and nonrenewal notice (Golub notice). The Golub notice stated that petitioner was terminating respondent’s tenancy on the alleged ground that respondent did not occupy the subject premises as a primary residence from December 1, 1998 to November 30, 2000. The Legislature has exempted from rent-regulation protection apartments that tenants do not use as their primary residence in order to return underutilized apartments to the marketplace. (See e.g. Emay Props. Corp. v Norton, 136 Misc 2d 127, 128 [App Term, 1st Dept 1987, per curiam].) The subject premises is a rent-stabilized single room occupancy (SRO) apartment located in the famed Windermere, the historical Grand Dame about which much has been written. (E.g. Elias Wolfberg, Ninth Ave. Noir, New York Times, Jan. 20, 2002, section 14, at 1, col 1; Mary Clark, Landmarking the New Bohemia, The Windemere: A “New Woman’s” Apartment House, The Clinton Chronicle [1993] <http://www.hellskitchennyc.com/ html/windemere.htm> [visited July 7, 2005], cached at <http:// www.courts.state.ny.us/reporter/webdocs/windemere.htm>.)
A trial was held over the course of six days. At the conclusion of the trial, respondent made three arguments to contest granting petitioner a possessory judgment. First, respondent argues that petitioner failed to prove that he has an alternative address that he uses as his primary residence. Second, he argues that the subject apartment was his primary residence during the Golub period. Third, he argues in the alternative that if the court finds that he did not live in his apartment as his primary residence, his mental disabilities provide an excusable reason for his extended absences from his apartment. In opposition, petitioner argues that respondent did not use the subject apartment as his primary residence during the Golub period and that it need not prove that respondent lived at an alternative address during the Golub period. Petitioner also argues that respondent’s mental condition is not an excusable reason for any substantial absence from the subject apartment.
*471 The court finds that petitioner met its burden of proof to show that respondent did not use the apartment as his primary residence or for actual living purposes during the Golub period. He maintained a homeless lifestyle likely caused, one psychiatrist explained, by substance abuse. Another psychiatrist stated that he is claustrophobic and hates his apartment. He hated his apartment so much that he applied for public housing stating that he was homeless. He stated that he was homeless because he really was homeless, although he had an apartment.
The court also finds that petitioner need not prove that respondent lived at an alternative address during the Golub period. It is enough that petitioner proved that respondent abandoned the apartment to live on the streets, in the park, on stoops, and at his friends’ homes. The Legislature’s objective of protecting the housing stock will not be advanced by allowing respondent to use the subject apartment as he did only to store his belongings, receive mail, and let his girlfriend shower.
The court additionally finds that respondent’s mental disabilities do not constitute an excusable reason for his absence from the subject apartment. Respondent failed to show that he will return and use the apartment as a primary residence. Both psychiatrists stated that he will not take medication or undergo treatment that might allow him to return to his apartment permanently. Accordingly, petitioner is granted a final judgment of possession. No judgment for use and occupancy was sought, however, and none is granted.
This court is not condemning respondent to a life of homelessness. Whether by choice or circumstance, respondent is already homeless. This court, rather, is fulfilling the Legislature’s mandate that rent-regulated apartments not used as a tenant’s primary residence be returned to the marketplace. Upward of 80% of the homeless population is homeless because they have no home and cannot find affordable housing. (See Marybeth Shinn and Beth Weitzman, Predictors of Homelessness Among Families in New York City: From Shelter Request to Housing Stability, 88 Am J Pub Health 1651 [1988].) Others are homeless, even if they have affordable housing, because, like respondent, they suffer from mental illness and substance abuse. (See Jonathan L. Hafetz, Homeless Legal Advocacy: New Challenges and Directions for the Future, 30 Fordham Urb LJ 1215, 1221-1231 [2003] [noting that traditional stereotype of homeless person is, like respondent, a single, adult, white substance-abusing male]; Christina Victoria Tusan, Homeless Families *472 from 1980-1996: Casualties of Declining Support for the War on Poverty, 70 S Cal L Rev 1141, 1175 [1997].) Respondent had affordable, rent-regulated housing but abandoned it.
2. The Motions
The parties have engaged in significant motion practice. They made 14 motions before the proceeding was marked ready for trial in December 2004. Most of the motions addressed respondent’s affirmative defenses. Respondent initially asserted seven affirmative defenses: (1) that petitioner failed to state a cause of action, (2) that the Americans with Disabilities Act (ADA; 42 USC §§ 12101-12213) requires that petitioner give respondent a reasonable accommodation, (3) that loches bars collecting use and occupancy, (4) that petitioner waived its right to recover use and occupancy, (5) that petitioner breached respondent’s warranty of habitability, (6) that granting petitioner use and occupancy would be an unjust enrichment, and (7) that equitable estoppel bars collecting use and occupancy. (See respondent’s answer ft 14-25.) Petitioner made several motions to compel discovery in response to respondent’s ADA defense. The parties’ motions resulted in a summary proceeding exceeding its fourth year.
On February 22, 2001, the Honorable Douglas Hoffman granted petitioner’s motion to strike respondent’s fifth affirmative defense for petitioner’s breaching the warranty of habitability. In March 2001, Judge Hoffman signed petitioner’s proposed order to compel disclosure. In July 2001, petitioner moved to strike respondent’s answer or in the alternative to preclude because respondent failed to appear at an examination before trial (EBT). Judge Hoffman resolved the motion by ordering respondent to appear at another EBT and to pay petitioner $104 a month in use and occupancy. On October 3, 2001, Judge Hoffman denied respondent’s motion to dismiss the proceeding on the basis that petitioner did not allege in the petition that it is licensed to do business in New York or identify its corporate status in the petition. (See TOA Constr. Co., Inc. v Tsitsires, NYLJ, Oct. 31, 2001, at 19, col 1 [Hous Part, Civ Ct, NY County].) In the same order, Judge Hoffman granted petitioner’s cross motion to amend the petition nunc pro tune to reflect accurately its status as a corporation and to state that it is licensed to do business in New York. (See id.)
On October 25, 2001, the Honorable Timmie Eisner granted petitioner’s second motion to strike respondent’s answer and counterclaims to the extent of ordering respondent to appear *473 for another EBT and to produce the documents petitioner requested. In December 2001, petitioner again moved to strike respondent’s answer, but it withdrew the motion on March 12, 2002. That same day, Judge Eisner denied petitioner’s motion to compel respondent to undergo an independent psychiatric evaluation. Judge Eisner also denied petitioner’s motion to strike respondent’s mental disability affirmative defense, a motion petitioner made because respondent failed to comply with petitioner’s discovery demands. That denial was conditioned on respondent’s complying with prior orders directing him to produce his medical records.
Petitioner appealed Judge Eisner’s denial of its motions to compel respondent to undergo an independent psychiatric evaluation and to strike respondent’s mental-disability affirmative defense for failing to comply with petitioner’s discovery demands. On March 21, 2003, the Appellate Term, First Department, affirmed. (See Toa Constr. Co. v Tsitsires, 2003 NY Slip Op 50651[U], *2-3 [App Term, 1st Dept 2003, per curiam].) In his dissenting opinion, Justice William P McCooe questioned the relevance of respondent’s ADA defense but argued that respondent should have to submit to an independent psychiatric exam because he had put his mental condition into controversy by asserting it as an affirmative defense. (Id. at *5.) Justice Mc-Cooe also warned the parties against further delaying trial. He wrote that “[t]he issues are clear cut and judicial resources are being wasted with a proceeding that should have been concluded.” (Id.)
On February 10, 2004, the Appellate Division, First Department, modified the Appellate Term’s affirmance by compelling respondent to submit to an independent psychiatric evaluation. (See Toa Constr. Co. v Tsitsires, 4 AD3d 141, 141 [1st Dept 2004, per curiam].) The First Department held that respondent put his mental condition in controversy by asserting an ADA affirmative defense and that petitioner had shown ample need for the examination. (See id. at 142.)
On August 30, 2004, the Honorable Anthony J. Fiorella, Jr., in a written opinion, granted petitioner’s motion to restore the proceeding to the court’s trial calendar. In the same opinion, Judge Fiorella granted respondent’s motion that petitioner produce the medical report he obtained from petitioner’s psychiatric evaluation. Judge Fiorella also granted petitioner’s cross motion for partial summary judgment to the extent of dismissing respondent’s ADA affirmative defense. Judge Fiorella found *474 that the ADA is not a viable defense to a nonprimary-residence holdover proceeding. Judge Fiorella then dismissed sua sponte respondent’s third through seventh affirmative defenses. He found them irrelevant in a nonprimary-residence holdover proceeding.
In September 2004, respondent moved to amend his answer to include affirmative defenses under Executive Law § 296 and Administrative Code of the City of New York § 8-107. Both laws prohibit owners from refusing to rent to a person based on that person’s disabilities. On October 6, 2004, in a written opinion, Judge Fiorella denied respondent’s motion to amend. Once again, Judge Fiorella found these laws irrelevant in a nonprimary-residence case.
The Honorable John S. Lansden decided the parties’ final two motions on December 20, 2004. In a written opinion, Judge Lansden denied respondent’s motion for summary judgment and petitioner’s cross motion for summary judgment. After reviewing the evidence the parties submitted to support their motions for summary judgment, Judge Lansden noted that petitioner did not have the traditional documentary evidence to prove its nonprimary-residence case. Because respondent did not have a driver’s license, a voter registration, utility bills, or tax returns, petitioner’s ability to prove that respondent did not use the subject apartment as his primary residence during the Golub period hinged on the parties’ witnesses’ credibility. He found that material issues of fact and credibility required a trial.
3. Evidence at Trial
The trial began on March 28, 2005, well after Justice McCooe wrote that the Appellate Term should direct that the “proceeding be tried within forty (40) days” of the court’s opinion of March 21, 2003. (See Toa Constr. Co., 2003 NY Slip Op 50651[U], *4 [McCooe, J., dissenting].) At both side’s request, some witnesses testified out of sequence. The trial evidence as related below reorganizes the evidence in a decipherable format.
At trial, petitioner presented documentary and videotape evidence and offered testimony from one of petitioner’s former employees to show that respondent did not use the subject apartment as a primary residence.
Petitioner submitted respondent’s phone bills from the Golub period. The phone bills show that respondent did not use the phone inside his apartment for months at a time. Petitioner *475 also provided credit card records showing that respondent used a telephone card to make telephone calls from payphones outside the subject premises when he did not use the telephone in his apartment during the Golub period.
Petitioner introduced into evidence respondent’s application for public housing dated May 1, 1996. In his application, respondent claimed that he was “homeless.” After the New York City Housing Authority (NYCHA) denied respondent’s application for public housing, he began a CPLR article 78 proceeding to overturn the agency’s denial. In his article 78 petition, respondent stated that he was “living outside in freezing temperatures,” that he was “living on the street,” and that he was “undomiciled.” (Respondent’s CPLR art 78 petition HIT 3, 13, 20.) In his affirmation in support of his reply to his article 78 proceeding, respondent again asserted that he was homeless. (Respondent’s affirmation in support of reply 1i 4.) To support his claim of homelessness, respondent asked in his article 78 request for judicial intervention that all correspondence be sent to 400 West 57th Street—the subject apartment—in care of his girlfriend, Alberta Lang. Respondent argued in his article 78 proceeding that, under the ADA, NYCHA discriminated against him when it failed to assign him a priority status to be placed in public housing. NYCHA had assigned respondent a priority status because it believed his claim that he was homeless. But respondent brought his article 78 proceeding because, he argued, NYCHA did not assign him additional priority for his mental disabilities. On October 30, 1998, Justice Herman Cahn dismissed respondent’s article 78 proceeding as academic because NYCHA placed respondent at the top of the waiting list for public housing.
Petitioner’s former superintendent and managing agent, Brian Michael McBrinn, testified for petitioner. From 1997, and during the Golub period, petitioner paid McBrinn to help the ailing Mark Burns, the subject building’s then-managing agent and superintendent. After Burns passed away in early 2000, petitioner hired McBrinn to be the building’s superintendent and managing agent. Before being hired, McBrinn had worked for a salary almost daily at the subject building, visiting four to five times a day. During that time he also visited daily with Burns. When he became the superintendent and managing agent, McBrinn worked six days a week at the subject building but was permitted to come and go as he pleased and thus worked irregular hours. McBrinn had an office inside the subject building.
*476 McBrinn testified that, between December 1, 1998 and November 30, 2000, not once did he see respondent enter or leave his apartment. McBrinn testified that he saw respondent merely in the lobby, and only six or seven times from 1997 to 2000. McBrinn also stated that on a few occasions during the Golub period he saw respondent on the street outside the subject building. He testified, however, that he saw Lang, respondent’s girlfriend, at the subject building regularly. He stated that when Lang left the building, her hair would often be wet. He also testified that he knocked on the subject apartment’s door 8 or 10 times during the Golub period when he heard a radio and voices inside the apartment but that no one answered. McBrinn noted that during this proceeding he signed an affidavit stating that he saw respondent more often than he actually did. Mc-Brinn testified that he notified petitioner’s attorneys that they should correct the affidavit but that they did not do so. At trial, McBrinn testified to the true number of times he claimed he saw respondent during the Golub period.
Petitioner then introduced a series of videotapes from a camera that photographed the subject building’s lobby, including the elevator doors and the doorway to the stairs. McBrinn testified that he installed the camera to monitor everyone who went into or out of the subject building for a four-month period, from August 17, 2001 to December 3, 2001. McBrinn stated that after watching the 2,544 hours of tape, he saw respondent enter the building only once, on November 24, 2001, and then leave about 40 minutes later. McBrinn noted that the video recorder recorded at a high rate of speed and when played back in a videocassette recorder, the tape speed makes it difficult to identify the individuals captured on tape. McBrinn testified, however, that he watched all the tapes on a video-playback machine with a 10-inch monitor that allowed him to slow down the tapes and view them at a slower speed. McBrinn further testified that petitioner paid him $2,300 in return for McBrinn’s buying the videotapes and the video-playback machine he used to watch the videos, for watching the 2,544 hours of videotapes, and for testifying at trial about the contents of the videotapes.
McBrinn noted that, before the trial commenced, petitioner fired him from his position as the subject building’s superintendent and managing agent. It was a corporate bloodbath. The president of petitioner corporation in Tokyo, Japan, even fired his son. McBrinn explained that, after petitioner fired him, he arranged for petitioner to keep some of his belongings in stor *477 age for him. MeBrinn stated, at trial that petitioner no longer had his belongings in storage. MeBrinn admitted that he was hostile toward petitioner after being fired. MeBrinn testified that petitioner treated the tenants “like dreck,” meaning “garbage,” and would not have made any repairs even if respondent had requested them. MeBrinn admitted that he warned respondent about the videotapes he had made for petitioner. He also admitted to sending an e-mail to respondent’s attorney on the eve of trial informing her about how petitioner planned to prove its case.
Respondent called Dr. Pazit Dinstein, a board-certified psychiatrist, to testify about his mental condition. Dr. Dinstein is employed as a psychiatrist at Westchester Jewish Community Services and has a private practice in Manhattan and Westchester. The court qualified her as an expert witness to testify about respondent’s mental condition. In May 2001, she explained, respondent underwent physical tests and then met with her for two hours. Dr. Dinstein also examined respondent’s 1994 medical reports from Roosevelt Hospital. She diagnosed respondent as suffering from panic disorder with agoraphobia, claustrophobia, and obsessive-compulsive disorder (OCD). She testified that respondent had suffered from major depression but that he is now no longer depressed. She defined respondent’s agoraphobia as a fear of public places where he feels he will not be able to get help if he needs it.
Dr. Dinstein testified that respondent stated in his medical records from Roosevelt Hospital that he “hated” his apartment and wanted to escape from it. Dr. Dinstein further testified that, during her evaluation, respondent stated that he would live outside the apartment for at least a week at a time and sometimes more. Dr. Dinstein noted that respondent has not been treated for his mental conditions since 1987 and that he does not plan to undergo further treatment. She admitted that respondent might have had a substance abuse problem in his late teens or early twenties; she said that respondent admitted to trying LSD and marijuana in college. Dr. Dinstein also addressed respondent’s ability to recall some events in great detail and his complete inability to recall other events. She stated that spotty memory is consistent with respondent’s OCD because he obsesses about some things but not about others. She concluded that respondent remembers with particular detail things about which he obsesses and easily forgets other things.
Petitioner called Dr. Gary Collins to rebut Dr. Dinstein’s testimony. Dr. Collins is also a board-certified psychiatrist, but *478 unlike respondent’s expert witness, he is a board-certified forensic psychiatrist. Dr. Collins has a private practice in New York City and works with outpatients suffering from depression. The court qualified Dr. Collins as an expert witness. Dr. Collins diagnosed respondent as suffering from “panic disorder not otherwise specified.” Dr. Collins disputed on several grounds Dr. Dinstein’s diagnosis that respondent suffered from agoraphobia, claustrophobia, and obsessive-compulsive disorder.
First, Dr. Collins testified that, in his experience, suffering from OCD, claustrophobia, and agoraphobia at the same time is so rare that it is implausible that respondent suffers from all three. Second, Dr. Collins pointed out that respondent’s expert did not conduct medical testing to exclude other possible causes for respondent’s symptoms before she rendered her diagnosis that respondent suffers from OCD. Dr. Collins testified that Dr. Dinstein should have performed a Yale-Brown Obsessive Compulsive Scale (Y-BOCS) test to determine whether respondent has OCD but that she did not do so. The Y-BOCS test is a questionnaire that asks the subject to rate obsessions’ and compulsions’ severity on a scale from 0 to 4. (See The Yale-Brown Obsessive Compulsive Scale chttp://www.brainphysics. com/ybocs.php> [visited June 30, 2005], cached at <http:// www.courts.state.ny.us/reporter/webdocs/BrainPhysics.htm>.) Dr. Collins further testified that Dr. Dinstein should also have performed a Leibowitz test for social anxiety (LSAS) but that she did not do that either. The LSAS is a questionnaire that asks subjects to rate their fear and avoidance of a range of common social interactions and situations. (See The Leibowitz Social Anxiety Scale <http://anxietyhelp.org/information/ leibowitz.html> [visited June 30, 2005], cached at <http:// www.courts.state.ny.us/reporter/webdocs/AnxietyDisorder.htm>.) Dr. Collins concluded that other psychological or substance abuse problems could be ruled out as causing respondent’s symptoms only if Dr. Dinstein had performed these tests.
Respondent gave his 500-page medical report to Dr. Collins two days before he was to testify. By the time he testified, Dr. Collins had read only 100 pages of the report. Yet Dr. Collins found several instances of respondent’s substance abuse about which Dr. Dinstein, who read the entire report, was unaware. The report indicated that respondent suffered alcoholic blackouts and was addicted to valium. Dr. Collins testified that respondent’s panic disorder is readily treatable through medica *479 tian and psychiatric treatment. Dr. Collins concluded that respondent refuses treatment because he does not want to take medication and risk suffering further drug dependency. Dr. Collins also concluded that his lengthy absences from his apartment are likely caused by a substance abuse problem.
At an examination before trial on November 28, 2001, respondent stated that he used the subject apartment during the Golub period in the same way and for the same amount of time he did from August 2001 to November 2001—when petitioner was videotaping the subject apartment. (Respondent’s Nov. 28, 2001 EBT, at 142, lines 2-15.) At that EBT, respondent also stated that, from September 2001 to November 2001, he did not leave the subject apartment for 60 days. (Id.) Respondent admitted that he was able to leave his apartment around November 26, 2001. (Id.) Respondent further stated at the EBT that he left the subject apartment the morning of November 26, 2001, at 3:30 or 4:00 a.m. (Id. at 142, lines 19-25, 2-13.) At the time of the EBT, respondent was unaware that petitioner had videotaped the subject building’s lobby from August 2001 to November 2001 to document his comings and goings. The entire EBT transcript was admitted into evidence on both side’s consent.
According to respondent, his mental disabilities prevent him from leaving his “safe area.” Respondent’s safe area is in Midtown Manhattan and on the lower Upper West Side. Because he cannot leave his safe area to go to court, he testified at an off-site location.
Respondent testified that he used and continues to use the subject apartment as his primary residence. He claims that, when he was there, he would spend four to eight hours a day in the apartment during the Golub period of December 1, 1998 to November 30, 2000. But he also testified that he would not spend any time in the apartment for weeks and sometimes months at a time. Respondent acknowledged that he often sleeps in the park, on stoops, at his friends’ homes, or on the street in his safe area rather than in his apartment. Respondent explained that during the Golub period he would come and go from the subject apartment when no one was in the lobby. He admitted that he does not have a key to his apartment; only Lang, his girlfriend, has a key, he said. Respondent admitted that Lang spends more time at the apartment than he does. He stated that Lang visits the subject apartment regularly to pick up mail and retrieve clothes and other belongings.
*480 At trial, respondent explained that his statements that he was “homeless,” “undomiciled,” and “living outside in freezing temperatures” in his application for public housing and in his article 78 proceeding were not admissions that he did not use the apartment. Respondent stated that others had told him the law allowed him to claim he was undomiciled because the conditions in his apartment made living there uninhabitable, even though he did not ask petitioner to correct any conditions in the subject apartment. He recalled with considerable specificity that a social worker and some lawyers told him that he could state that he was homeless in his application for public housing. Respondent said that he resisted lying for a long time, but the others talked him into it after they assured him that it was not a lie.
Respondent called Lang, his girlfriend, to testify on his behalf. She testified that, during the Golub period, respondent was in the subject apartment every day of the week, during daylight hours. Lang stated that respondent would leave late at night to go for walks but that he did not spend time in other apartments and that he almost always slept in his apartment. Lang testified that, during the Golub period, respondent would eat outside but that they often brought food home. Lang further testified that respondent claimed in his public housing application that he was homeless because the subject apartment had holes in the walls, water leaks, mold, and no gas, although she, too, admitted that she never complained about the conditions to petitioner. Lang stated that the apartment was in much worse condition years ago. When asked why respondent requested in his article 78 proceeding that correspondence be sent to his apartment in care of her, Lang stated that a social worker advised them that it would be better to do it that way. Lang further stated that, during the four months that petitioner videotaped the subject building’s lobby, she visited the subject apartment two or three times a week. Lang stated that when she would visit she would turn on the radio and often take a shower before leaving. She also said that respondent visited the subject apartment much less while petitioner was videotaping the subject apartment than he did during the Golub period.
On April 27, 2005, the court inspected the subject apartment. It was unfit for habitation.
4. Findings of Fact
A. Credibility Determinations
The evidence establishes that respondent used the apartment in question during the Golub period only as a storage facility *481 and for Lang to shower. Respondent kept his belongings there and had Lang retrieve mail at that address, but he did not use the apartment for actual living purposes. Although respondent does not have the usual accouterments of tax returns, a driver’s license, or utility bills to prove or rebut petitioner’s claim that respondent did not use the subject apartment as a primary residence, petitioner introduced into evidence respondent’s telephone bills and credit card bills showing that during the Golub period respondent did not use the subject apartment’s telephone for months at a time, while at the same time using public telephones. While helpful to petitioner, respondent’s telephone records do not establish conclusively whether respondent resided primarily in the subject apartment. Analyzing the witnesses’ credibility is essential to determining whether the subject apartment was respondent’s primary residence during the Golub period.
The court finds credible McBrinn’s testimony regarding respondent’s absence from the subject apartment during the Golub period. McBrinn testified that from 1997 to 2000 he saw respondent only six or seven times, and only in the building’s lobby. Respondent argues that, because McBrinn did not work 50 to 60 days a year, his testimony is irrelevant to determining whether respondent used the subject premises as a primary residence during the Golub period. Respondent further argues that because McBrinn did not work during the hours that respondent alleged he entered and left the subject apartment, the court should ignore his testimony about respondent’s comings and goings. But McBrinn worked six days a week and at all hours of the day and night. During the same time period, Mc-Brinn admitted that he saw respondent’s girlfriend enter and leave the subject building regularly. McBrinn’s testimony is relevant in ascertaining whether respondent was at the subject building during the Golub period. McBrinn’s testimony is corroborated by respondent’s telephone records, which show he did not use the subject apartment’s telephone for months at a time during the Golub period.
The court also credits McBrinn’s testimony about the videotapes. Respondent argues that the videotapes, taken after the Golub period, are irrelevant to whether he used the apartment as a primary residence during the Golub period. But the tapes matter because respondent swore in his EBT that he used the subject apartment for the same amount of time during the Golub period that he did during the period McBrinn monitored *482 the subject building’s lobby with a video camera. McBrinn testified that, in the four months he videotaped the subject building’s lobby, he saw respondent visit the building once, and then only for 40 minutes.
Respondent contends that, because the tape was recorded at a high speed, McBrinn was unable to identify him on the tapes. Respondent further argues that McBrinn was unreliable because he watched the videotape on a 10-inch monitor. McBrinn testified credibly, however, that although he viewed the tapes at a high speed, he slowed the tape’s speed whenever people were visible in the lobby to determine whether one of the people was respondent. McBrinn further testified that he could identify individuals despite viewing the tapes on a 10-inch monitor. After viewing a portion of the videotapes, the court notes that viewers are able to see clearly the individuals in the lobby. The court is satisfied, therefore, that McBrinn testified honestly about the videotapes.
Respondent contends that the court should disregard Mc-Brinn’s testimony because he admitted that he perjured himself in an affidavit. During the proceeding, McBrinn signed an affidavit that he saw respondent during the Golub period less often than he actually did. McBrinn testified that he notified petitioner’s attorneys that they should correct the affidavit. At trial, McBrinn testified to the correct number of times that he saw respondent during the Golub period. That the affidavit was not corrected—a small matter overall—is at bottom McBrinn’s fault. He should not have signed an inaccurate affidavit. But that does not make McBrinn a perjurer or his testimony not credible.
Respondent argues that McBrinn was biased because petitioner allowed him to keep in storage some of his belongings, which McBrinn left behind in the building after he stopped working for petitioner. Respondent contends that McBrinn felt obligated to testify favorably for petitioner in return for being allowed to store his belongings. Respondent’s point is that Mc-Brinn lied to help petitioner’s case. McBrinn admitted that, at the time of trial, petitioner no longer held his belongings in storage. Moreover, McBrinn testified that by then he had long since stopped having any relationship with petitioner. Petitioner could not have coerced McBrinn to testify against respondent in exchange for storing his belongings. McBrinn had no reason to lie at trial to repay petitioner for that.
Respondent further argues that McBrinn’s testimony regarding the videotapes is unreliable because petitioner paid Me *483 Brinn $2,300 to review the tapes and document whether respondent entered and left the subject apartment. McBrinn’s compensation for reviewing the tapes was pennies an hour for the 2,544 hours he spent reviewing them. Moreover, McBrinn’s fee included compensation for his testimony about the tapes and to pay McBrinn for buying them and the video-playback machine. McBrinn’s compensation did not affect his testimony. He merely fulfilled his promise to petitioner.
Another reason why McBrinn’s testimony was honest and accurate is that he harbors ill will toward petitioner, whose owner fired him. McBrinn admitted that, because of his animosity toward petitioner, he contacted respondent to warn him about the videotapes that he, McBrinn, made at petitioner’s behest to document respondent’s comings and goings. McBrinn further admitted to warning respondent’s attorney about petitioner’s litigation strategy. McBrinn sent a lengthy e-mail to respondent’s attorney on the eve of trial explaining how petitioner planned to prove its case. He even testified that, had respondent asked petitioner to repair the subject apartment, petitioner would not have made the repairs because petitioner treated its tenants “like dreck.” McBrinn’s frank testimony showed neutrality toward respondent and hostility toward the side that called him at trial. That made his testimony exceptionally candid and reliable.
Respondent never explained the discrepancy between Mc-Brinn’s testimony and his own about his presence at the subject apartment. McBrinn testified that he saw respondent six or seven times from 1997 to 2000, and only in the lobby. He testified that he never saw respondent enter or leave his apartment during the Golub period. He further testified that the videotapes show that respondent visited the subject building for 40 minutes once in four months. Respondent, however, stated at his November 28, 2001 EBT that he used the subject apartment regularly while the video camera was recording the activity in the building’s lobby. That discrepancy shows the unreliability of respondent’s testimony.
Of determinative significance, moreover, is that respondent did not point to any inaccuracy in McBrinn’s testimony about the videotapes. Respondent’s inability to show that he is on the tape more often than McBrinn claimed—once in four months, for 40 minutes—renders suspect his argument that McBrinn testified falsely about the videotapes.
Respondent also failed to explain the discrepancy between Lang’s testimony and his own about his presence at the subject *484 apartment. Respondent testified that he was at his apartment for four to eight hours a day during the Golub period. Respondent admitted that he would spend long periods of time away from the subject apartment, staying for months at a time in a park, on the streets, on stoops, or at his friends’ homes. Lang contradicted him. She testified that she and respondent spent every day at the subject apartment during the Golub period. Lang also denied that respondent spent any time living anywhere else, while respondent himself admitted that this was not so. On the other hand, Lang corroborated McBrinn’s testimony that she often left the building with wet hair and that he heard voices and a radio from inside the subject apartment; she testified that she took showers and turned on the radio when she visited the subject apartment.
Respondent also failed to explain his statements in his application for public housing that he was “homeless,” “undomiciled,” “living outside in freezing temperatures,” and “living on the street.” Respondent claimed that he thought he could allege he was homeless because he found the subject apartment uninhabitable. The court’s own inspection revealed that the subject apartment is currently unfit for human habitation. And Lang testified that the apartment was in worse condition years ago. That the conditions were worse then gave respondent a motive not to live there and shows either that he did not live there—so that he did not care about the apartment’s uninhabitable conditions—or that he is so substance abused that he did not know habitable from uninhabitable. Even if, moreover, respondent’s complaints might have fallen on deaf ears, he nevertheless never complained to petitioner about the conditions in the subject apartment, or requested that petitioner make repairs, or brought a Housing Part (HP) proceeding even though many lawyers represented him.
Respondent further explained that it was not his idea to allege that he was homeless in his application for public housing. He stated that others told him to do it. The other people respondent alleged told him to claim he was homeless in his article 78 petition—social workers and lawyers expert in housing court proceedings—would not have advised him to claim he was homeless to get a priority status for public housing. They would have brought an HP proceeding on his behalf or advised him to withhold rent to obtain repairs. Moreover, respondent did not testify that he believed that his requests would go unanswered because, as McBrinn stated, petitioner would ignore any tenant’s request *485 for repairs. Respondent’s explanation that he considered his apartment uninhabitable is also unbelievable in light of his claim in his EBT that he spent 60 days in his apartment from September 2001 to November 2001 without leaving.
Respondent’s failure to explain his statements in his public housing application and article 78 petition diminishes his credibility. It was to his advantage to say he was homeless. Relying on his word, NYCHA assigned respondent a priority status to place him in public housing because he claimed he was homeless. Respondent’s request that correspondence about his article 78 proceeding be sent to the subject apartment in care of his girlfriend bolstered his claim of homelessness. This court believes that respondent gave Lang’s name because he did not live there and thus would not get his mail. Only Lang picked up the mail. Ultimately, his statements in his application for public housing and his article 78 petition show either that respondent is willing to misrepresent facts to get what he wants or that he really was homeless, given his homeless lifestyle. Either possibility harms respondent’s case that he lived in the subject premises.
The court finds respondent’s testimony incredible. Respondent was able to testify about certain things in remarkable detail when he thought that the testimony supported his position. When cross-examined, however, he claimed ignorance of facts he thought might hurt his position. Dr. Dinstein testified that respondent’s selective memory is a symptom of his OCD. But respondent remembered everything that helped him and nothing that hurt him. Respondent explained his inability to answer petitioner’s attorney’s questions on the basis that the attorney made him nervous. For example, on direct examination respondent explained his statements in his application for public housing and remembered the names and details of the social workers and attorneys who helped him. On cross-examination, respondent stated that he could not remember details about his current living arrangement or even “what I had for breakfast this morning.” More than just evasive on cross-examination, respondent’s testimony was inconsistent with both McBrinn’s and Lang’s—his own witness—and contradicted by the videotapes. The court therefore rejects respondent’s testimony about his use of the subject apartment during the Golub period.
The court credits petitioner’s expert witness more than it does respondent’s expert witness. Respondent’s expert witness did not conduct the Y-BOCS and LSAS tests necessary to rule in *486 the possibility of OCD. The court further credits petitioner’s expert witness because, after reviewing only 100 pages of respondent’s 500-page medical report, he found several examples of respondent’s substance abuse of which respondent’s expert witness was unaware, even though she had reviewed respondent’s entire medical report. Also, petitioner’s expert is a board-certified forensic psychiatrist, and respondent’s expert is not.
Respondent argues that, if the court finds that he did not live in his apartment, he had an excusable reason for his absence: his mental condition prevented him from living there for extended periods of time. But according to his own medical records, respondent told a Roosevelt Hospital employee that he hated his apartment and wanted to escape from it. Respondent’s expert witness testified that he is claustrophobic. Respondent’s expert further stated that his mental condition can be managed with medication and therapy but that respondent refuses to undergo any treatment for his conditions. Petitioner’s expert witness corroborated respondent’s expert’s testimony that respondent refuses treatment for his mental conditions.
B. Factual Conclusions
McBrinn’s credible testimony establishes that respondent was absent from the subject apartment and did not use it as his primary residence during the Golub period. McBrinn testified he only saw respondent six or seven times in the subject building’s lobby in the four years from 1997 to 2000. McBrinn testified that, during that time, he never saw respondent enter or leave the subject apartment. McBrinn’s testimony that respondent did not live in the subject apartment is corroborated by respondent’s telephone records. They show that respondent did not use his telephone for months at a time during the Golub period. Respondent’s credit card statements show that, during the same time, he was using pay telephones in his safe area rather than the telephone in his apartment. Respondent further corroborated McBrinn’s testimony when he stated at his EBT that he used the subject apartment for the same amount of time during the Golub period as he did when petitioner was videotaping the subject premises’ lobby. As McBrinn testified, the videotapes show that respondent visited the apartment once in four months, and then only for 40 minutes.
The court accepts petitioner’s expert’s diagnosis that respondent suffers from panic disorder not otherwise specified, not the rare combination of agoraphobia, claustrophobia, and OCD. The court accepts petitioner’s expert’s conclusion that respondent’s *487 substance abuse causes him to spend long periods of time away from the subject apartment. Respondent himself claimed he was homeless when he applied for public housing. That respondent considered himself homeless despite having an apartment is consistent with that psychiatric opinion.
To rebut petitioner’s evidence that he did not live in the subject apartment, respondent testified that he lived in the apartment during the Golub period. Respondent’s testimony about his use of the subject apartment during the Golub period is incredible. His testimony contradicted Lang’s testimony that he used the apartment every day and that he never left the apartment for long periods of time. Respondent admitted that he does not have a key to the subject apartment but rather that Lang keeps the key. Lang visits the subject apartment, dropping off items, picking up mail, and taking showers. But when Lang was absent, respondent could not enter or leave the subject apartment. Respondent’s admission that he does not have a key further establishes that he does not use his apartment to live in it. It is a place for him to store belongings, get mail, and let his girlfriend shower.
5. Conclusions of Law
A. Petitioner’s Burden of Proof
Before deciding whether petitioner has proven by a preponderance of the evidence whether respondent uses the subject apartment as his primary residence, the court must address respondent’s argument that petitioner has the additional burden to show that respondent maintains his primary residence in a place other than at the subject apartment. Respondent argues that petitioner cannot meet its burden. According to respondent, if he does not live in the subject apartment, then he lives on the streets and in parks, not in another residence.
Respondent’s SRO apartment is subject to the Rent Stabilization Law of 1969 (RSL) because his building has more than six residential units. (Administrative Code § 26-504 [a].) Under RSL § 26-504 (a) (1) (f) and Rent Stabilization Code (RSC) (9 NYCRR) § 2520.11 (k), the subject apartment is exempt from rent stabilization protection if respondent did not occupy the apartment as his primary residence during the Golub period. To prove that respondent did not use the subject apartment as his primary residence, petitioner must establish by a preponderance of the evidence that respondent does not have an “ ‘ongoing, substantial, physical nexus with the controlled premises for actual living purposes.’ ” (Berwick Land Corp. v Mucelli, 249 *488 AD2d 18, 18 [1st Dept 1998, mem], quoting Sommer v Ann Turkel, Inc., 137 Misc 2d 7, 10 [App Term, 1st Dept 1987, per curiam].)
Respondent relies on Sharp v Melendez (139 AD2d 262 [1st Dept 1988]), in which the Appellate Division, First Department, found that, to prevail in a nonprimary-residence holdover, a landlord must establish that “the tenant maintains a primary residence in a place other than the [housing accommodation sought to be recovered].” (Id. at 264.) The issue in Melendez was whether two noncontiguous apartments leased by the same tenant constituted a single primary residence. (See id. at 263.) The tenant in Melendez suffered from a chronic illness and rented a second apartment in the same building so that his parents could live nearby and care for him. (See id.) The landlord commenced a nonprimary-residence proceeding after learning that the tenant spent all his time in one apartment while his parents lived in the other. The Melendez court did not hold that landlords must prove that tenants live at an alternative address to obtain a possessory judgment in a nonprimaryresidence proceeding. It held, rather, that the tenant’s two noncontiguous apartments were a single residence and thus that the landlord failed to prove that the tenant did not have a substantial physical nexus to the apartment petitioner sought to recover. (See id. at 266.)
In his dissenting opinion to the Appellate Term’s opinion in petitioner’s appeal in this case, Justice McCooe summarized petitioner’s burden of proof. Justice McCooe addressed respondent’s point made during the appellate oral argument that petitioner has the burden to show that respondent has another residence. Justice McCooe stated that:
“This is a common but incorrect statement of the law which should be understood so that error is not committed at the trial. The Petitioner has to prove that the tenant does not reside in the subject apartment. It does not have to prove where he resides. Furthermore if he is ‘homeless’ he would not have another residence.” (Toa Constr., 2003 NY Slip Op 50651[U], *6.)
Although Justice McCooe’s discussion in dissent concerned not the exact issue on appeal—whether respondent had to submit to a psychiatric examination—his explanation of the law is compelling. Petitioner need not prove that respondent primarily resided at an alternative address. Petitioner’s burden is *489 to show only that respondent does not use the subject apartment as a primary residence during the Golub period. (See e.g. Sommer, 137 Misc 2d at 10 [reversing trial court and granting possessory judgment after finding that tenant visited subject apartment only occasionally].) Establishing that a tenant has an alternative primary residence is one way for a landlord to meet its evidentiary burden. It is not a landlord’s only way.
B. Primary Residence
Determining a tenant’s physical nexus to a subject apartment is a fact-sensitive inquiry. Under New York City Rent and Eviction Regulations (9 NYCRR) § 2200.3 (j), the factors the court must consider include, but are not limited to (1) whether respondent uses an alternative primary address on any tax return, motor vehicle registration, driver’s license, or other document filed with a public agency; (2) whether respondent registered to vote using an alternative address; (3) whether respondent lived in the apartment for less than 183 days in the most recent calendar year; and (4) whether respondent sublet the apartment. These factors must be viewed in their totality; no single factor is determinative. (Chelsmore Apts. v Garcia, 189 Misc 2d 542, 544 [Hous Part, Civ Ct, NY County 2001].)
Courts also consider other factors, not included in section 2200.3 (j). For example, a tenant’s relevant window-period telephone bills that show how frequently a tenant used the telephone in a rent-regulated unit is a factor in deciding whether a tenant has the requisite physical nexus. (Janco Realty Co. v Lee, NYLJ, July 16, 1987, at 11, col 1 [App Term, 1st Dept, per curiam], affd 141 AD2d 1011 [1st Dept 1988].) A landlord’s employee’s testimony about a tenant’s absence from a rent-regulated unit is also a factor. (Harran Holding Corp. v Fowler, NYLJ, Apr. 28, 1987, at 5, col 4 [App Term, 1st Dept, per curiam].) Evidence of utility usage in a rent-regulated unit during the relevant period of time is yet another factor. (Mandel v Steinman, NYLJ, Oct. 10, 1985, at 11, col 3 [App Term, 1st Dept, per curiam].) A tenant’s intent to return to use the rent-regulated unit as a primary residence is a factor but is not determinative. (Emay Props., 136 Misc 2d at 128.) The ultimate issue is whether the landlord proved by objective evidence that the tenant failed to maintain “an ongoing, substantial, physical nexus with the controlled premises for actual living purposes.” {Id. at 129.)
For the reasons given in this court’s findings of fact, petitioner proved that respondent does not use the subject apartment as *490 his primary residence. Respondent’s physical nexus to the apartment was neither ongoing nor substantial. (See Berwick Land Corp., 249 AD2d at 18-19 [granting petitioner possessory judgment].) Respondent also did not use the subject apartment for “actual living purposes.” (Rocky 116 v Weston, 195 Misc 2d 363, 364 [App Term, 1st Dept 2003, per curiam] [affirming finding that tenant did not use subject apartment as primary residence].)
A tenant using a rent-regulated apartment “for storage[ ] is not one who is a victim of the. housing crises but may rather be said to be a contributing and exacerbating factor in the continuation of the critical shortage of affordable apartments.” (Great N. Realty, Inc. v Ward, NYLJ, Sept. 30, 1999, at 28, col 6, at 29, col 1 [App Term, 1st Dept, Davis, J., dissenting].) As in Great N. Realty, respondent used his apartment primarily for storage— and for his girlfriend to get mail and shower. The Rent Stabilization Law and Code’s goal of preserving housing stock would be served poorly by allowing respondent to retain the apartment. Doing so will encourage tenancies of convenience. (See Cier Indus. Co. v Hessen, 136 AD2d 145, 150 [1st Dept 1988].)
The issue remains whether respondent has presented an excusable reason for his extended absence from the subject apartment.
C. Credible Excusable Reason for Tenant’s Absence
A tenant’s underutilization of a rent-regulated premises “may not alone suffice for a finding of nonprimary residence, at least in circumstances where the tenant’s absence is attributable to a credible, excusable reason.” (Emel Realty Corp. v Carey, 188 Misc 2d 280, 282 [App Term, 1st Dept 2001, per curiam], affd 288 AD2d 163 [1st Dept 2001, per curiam].) Despite the Appellate Term’s statement in the majority opinion in petitioner’s appeal that “the psychological underpinnings of tenant’s occupancy status is of little, if any, relevance to the outcome of the proceeding” (Toa Constr., 2003 NY Slip Op 50651[U], *2-3), and despite Judge Fiorella’s dismissal of respondent’s ADA defense, this court now must consider respondent’s argument that his mental disabilities amount to an excusable reason for his absence from the subject apartment during the Golub period.
Whether respondent’s mental illness is an excusable reason for his absence is novel. Respondent analogizes to other excuses that tenants have offered for their absence from their regulated apartments when defending nonprimary-residence cases.
*491 i. A Tenant’s Professional Obligations as an Excusable Reason for Absence
Respondent first points to a line of cases in which courts found excusable a tenant’s extended absence due to professional obligations. (See e.g. Sarraf v Szunics, 132 Misc 2d 97, 99 [Hous Part, Civ Ct, NY County 1986]; Coronet Props. Co. v Brychova, 122 Misc 2d 212, 213-214 [Hous Part, Civ Ct, NY County 1983], affd 126 Misc 2d 946, 946 [App Term, 1st Dept 1984, per curiam].) For their absence from the regulated apartment to be excusable, tenants must show that (1) they live in the apartment when in New York City, and (2) they intend to live continuously in the apartment when their profession no longer requires extensive travel. (E.g. Coronet Props., 122 Misc 2d at 214.) Respondent’s analogy to this line of cases fails. He never left New York City or his safe area. Respondent, moreover, has not shown that he will live in and have a substantial physical nexus to the subject apartment. Respondent admitted that he hates his apartment and, to obtain public housing, claimed that he was homeless.
ii. A Tenant’s Prison Sentence as an Excusable Reason for Absence
Respondent next points to 216-220 E. 67th St. Assoc. v Quinn (136 Misc 2d 188 [Civ Ct, NY County 1987]), in which the court held that a tenant sentenced to prison for four years did not forfeit his primary-residence status. (Id. at 191.) In so holding, the court relied on the tenant’s substantial evidence that his “familial, professional and residential ties are all to New York City and to the apartment in question.” (Id. at 190.) A tenant’s absence due to a prison sentence, however, is inexcusable if the tenant is unlikely to return in the near future to use the apartment as his primary residence. (Emay Props., 136 Misc 2d at 128 [finding that tenant sentenced to 15 years to life no longer primarily resided in rent-regulated apartment].) Respondent’s reliance on Quinn is misplaced. Respondent has failed to provide any evidence that he maintains “familial, professional and residential ties” to the subject apartment. (See Quinn, 136 Misc 2d at 190.) Unlike the tenant in Quinn, who wanted to return to his apartment when released from prison, respondent’s own psychiatric expert testified that his mental condition explains respondent’s need to escape from his apartment.
iii. A Tenant’s Medical Treatment as an Excusable Reason for Absence
Respondent also argues that his absence is analogous to a tenant’s absence to receive medical treatment. Absence due to *492 medical treatment is excusable if (1) the tenant’s relocation was involuntary, (2) the tenant did not abandon the premises to live elsewhere, and (3) the tenant soon will resume or has resumed living in the subject premises as a primary residence. (Katz v Gelman, 177 Misc 2d 83, 84 [App Term, 1st Dept 1998, per curiam] [finding that tenant had not abandoned regulated loft as primary residence while he was undergoing extensive medical treatment in residential transition home].)
Respondent’s analogy between his mental-condition-induced absence and a tenant’s absence for medical treatment cannot succeed. He has not shown that his mental condition makes his absence from the subject apartment involuntary. Moreover, he abandoned his apartment to live in his safe area at friends’ homes, in the park, on stoops, or on the streets. Respondent has also failed to show that he will return to the apartment to use it as his primary residence. Even if respondent’s psychiatrist is correct that he suffers from both agoraphobia and claustrophobia, respondent cannot live primarily in the subject apartment. More likely is petitioner’s psychiatrist’s explanation that respondent will not return to the subject apartment because his substance abuse causes his homeless lifestyle,
iv. Respondent’s Proposed Excusable Reason
The two common factors in the cases finding that tenants presented excusable reasons for their absences are (1) whether the tenants will live in the subject premises when they are able to do so, and (2) whether the reason for their absence will end so as to allow them to use the subject premises as a conventional primary residence. Tenants are prohibited from using a rent-regulated apartment as a “pied a terre to be used for occasional visits.” (Coronet Props., 122 Misc 2d at 214; accord Emel Realty, 288 AD2d at 163 [affirming possessory judgment and finding that tenant failed to present reasonable excuse for failure to live in apartment when staying in New York City].) Petitioner has shown and respondent has failed to rebut that respondent used the subject apartment only as a convenient place to store his belongings, pick up his mail, and allow his girlfriend to shower. Both respondent’s and petitioner’s expert witnesses made it clear that, without medical treatment, respondent will not be able to overcome his mental disabilities and return to use the subject apartment as his primary residence. Yet respondent refuses the necessary medical treatment that might allow him to return permanently to the subject apartment.
The court declines to extend rent regulation protection to a tenant who claims that his mental condition prevents him from *493 living in the subject apartment. Respondent’s physical nexus to the apartment is not a subjective standard to be tailored to his mental outlook and lifestyle. If the court were to allow the primary-residence standard to become subjective, the standard would eventually become one of infinite variation and gradation. Courts would be asked to decide whether tenants’ subjective feelings about their apartments amount to a sufficient mental condition to constitute an excusable reason for their absence. And then tenants would enjoy rent regulation protection without actually having to live in a rent-regulated apartment. Ultimately, courts must use objective facts and evidence, not a tenant’s mental condition, determined subjectively, to ascertain whether the tenant presents credible, excusable reasons for being away from an apartment for two years.
The Legislature’s intent behind providing tenants rent stabilization protection is to alleviate the harms that stem from a housing shortage. (See Sommer, 137 Misc 2d at 10.) The Legislature extended rent regulation protection only to those tenants who actually use their apartments as their primary residence. (See Emay Props., 136 Misc 2d at 128.) The purpose of exempting from rent regulation apartments that tenants do not use as primary residence is to return underutilized apartments to the marketplace for people to occupy them as their primary residences. (Id.) Were the law otherwise, someone who has a home but is homeless would take away a home from a homeless person who has no home.
9. Conclusion
Final judgment of possession for petitioner. Petitioner has demonstrated by a preponderance of credible evidence that respondent did not maintain the subject apartment as his primary residence during the Golub period, and respondent has not offered an excusable reason for his absence.